

**Signed and Filed: March 20, 2008**

_____
**THOMAS E. CARLSON**
**U.S. Bankruptcy Judge**
_____

**UNITED STATES BANKRUPTCY COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re | ) Case No. 06-30387 TEC 7 |
| | ) |
| MARIA O. SEGOVIA, | ) |
| | ) Chapter 7 |
| Debtor. | ) |
| | ) |
| _____ | ) |
| E. LYNN SCHOENMANN, TRUSTEE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Adv. Proc. No. 06-3180 TC |
| | ) |
| BACH CONSTRUCTION, INC., VICTOR A. | ) |
| SEGOVIA, an individual, and WELLS | ) |
| FARGO BANK, N.A., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |
| BACH CONSTRUCTION, INC., | ) |
| | ) |
| Cross-Claimants, | ) |
| | ) |
| vs. | ) |
| | ) |
| VICTOR A. SEGOVIA, | ) |
| | ) |
| Cross-Defendant. | ) |
| _____ | ) |

**MEMORANDUM DECISION**

The court conducted a trial in the above-captioned proceeding from December 3-5, 2007. David D. Draper appeared for Bach

MEMORANDUM DECISION                    -1-

Construction, Inc. (BCI). Victor A. Segovia (Victor) appeared on his own behalf. This memorandum constitutes the court's findings of fact and conclusions of law regarding BCI's and Victor's cross-claims. For the reasons stated herein, the court sustains in part BCI's objection to Victor's claim, and determines that BCI's equitable subordination claim is moot.[1]

**FACTS**

In the beginning of 2000, Maria Segovia (Maria), a bank executive employed by Wells Fargo,[2] owned residential real property located at 320 Maple Street (the 320 Property) and 322 Maple Street (the 322 Property), San Francisco, California (collectively, the Properties).[3]

On February 17, 2000 and April 3, 2000, Peter Bach, on behalf of licensed general contractor BCI, and Maria executed a written demolition agreement and a written remodel agreement (Remodel Contract) regarding the 320 Property. Both agreements require Maria to pay BCI its costs plus 20% (10% for overhead, 10% for BCI's profit) and provide that payments made more than 10 days after billing will bear interest at 18% per annum. The contracts include a written estimate that the total cost would be $351,000.

---

[1] The court has already overruled Victor's objection to BCI's claim. See infra at 9, n.15.

[2] Maria began working at Wells Fargo in 1974, and worked there until her termination on October 5, 2005.

[3] Maria, her mother Olga, and her sister Patricia held record title to the Properties as follows: Maria, 50%; Olga, 34%; and Patricia, 16%.

**MEMORANDUM DECISION** -2-

1    The Remodel Contract is printed in at least 10-point typeface;[4]
2 includes a description of the work to be performed; identifies the
3 start date of the project; specifies payment terms; provides when
4 and how mechanics' liens will be released; provides a process for
5 change orders; contains a notice that contractors are required by
6 law to be licensed; provides that the parties shall exchange
7 certificates of insurance; notifies Maria of her right to require
8 BCI to provide a performance and payment bond; includes a waiver of
9 Maria's statutory right to cancel the contract; attaches a two-and-
10 one-half page addendum regarding the California mechanic's lien
11 law; and contains a provision that the prevailing party in
12 litigation under the contract shall be entitled to reasonable
13 attorneys fees and expenses.

14    BCI first billed Maria on March 1, 2000.  By February 2001,
15 BCI had billed Maria for $350,000, and Maria had paid all of BCI's
16 invoices in full and without complaint. (Plaintiffs' state-court
17 trial exhibit no. 101).  Maria expressed her complete satisfaction
18 regarding the work BCI had performed on the 320 Property.
19 (Defendant's state-court trial exhibit no. 1092).  Maria also
20 introduced Peter Bach to a Wells Fargo colleague, recommending BCI
21 for construction work needed by Wells Fargo.  (Id.)  Maria and
22 Peter Bach had become friends, meeting at family gatherings.

23    In the spring of 2001, after Maria noticed that her next-door
24 neighbors had reaped a $1.5 million profit on the sale of their two
25 flats, she and BCI entered into an oral contract to remodel the 322

26

27    [4] As discussed below, home improvement contracts are highly
28 regulated in California and must contain certain provisions and
   have a format specified by statute.  See Cal. Bus. & Prof. Code
   § 7159.  The Remodel Contract did not contain all of the required
   provisions and had some formatting errors.

MEMORANDUM DECISION          -3-

Property. (See Defendants' state-court trial exhibit nos. 1069, 1073, and 1428 at 13:22-28; 14:1-10). Throughout 2001 and most of 2002, Maria did not dispute any of BCI's bills, and did not complain about the quality of BCI's work on the 322 Property.

Maria began to complain about the amount of BCI's bills (but not the quality of BCI's work) only when she began to have trouble refinancing the Properties to pay those bills. (E.g., Defendants' state-court exhibit nos. 1115, 1119). In an e-mail to Peter dated October 25, 2002, she specifically questioned why BCI had charged $140,000 more than what the parties had agreed to. (Id., no. 1120). Peter promptly responded that he was preparing a list of the additional work Maria had requested. (Id., no. 1122).

On November 22, 2002, Maria's refinance application was denied. (Id., no. 1126). Maria explained to Peter that the appraised value of the Properties had decreased by $700,000 between April and November 2002, that the loan-to-value ratio had jumped from 42% to 71%, and that she could not obtain the loan without a co-signor. (Id.)

In December 2002, although Maria continued to question Peter about a limited portion of the amount BCI had charged re the 322 Property, she e-mailed Peter that she would pay BCI the amounts owing. (Id., nos. 1133, 1137).

Although Maria substantially was behind in payments to BCI, BCI did not stop work on the 322 Property or charge Maria interest on her late payments.[5] BCI offered to meet with Maria to answer her questions. (See Defendants' state-court trial exhibit no. 1147).

_____

[5] The first time BCI charged Maria interest on her late payments was in November 2003. See infra at 5, n.7.

Case: 06-03180   Doc# 88   Filed: 03/20/08   Entered: 03/20/08 16:19:01   Page 4 of 21

On March 27, 2003, BCI issued an invoice showing $15,613 due for services and materials provided by five subcontractors and one vendor (the March Invoice).[6] BCI waived its normal charges for labor, profit, and overhead, totaling $6,123. Maria did not pay the March Invoice.

On November 14, 2003, BCI issued a new invoice (November Invoice), which contained the same items in the March Invoice, plus an additional fee for glass provided by W.J. Banks ($1,591), plus BCI's labor ($3,150), plus 20% for overhead and profit ($4,071). The principal amount of the November Invoice totaled $24,425. The November Invoice also included accrued interest in the amount of $25,011.[7] Maria did not pay the November Invoice.

In early December 2003, Maria retained her brother Victor, a licensed attorney, to handle her dispute with BCI. Victor wrote a letter to counsel for BCI, disputing the March and November Invoices, and arguing that Maria had ordered BCI to stop all work on August 28, 2002.

In December 2003, counsel for BCI sent two written offers to Victor to settle the matter for immediate payment of the principal amount of $24,425.[8] When BCI was unable to substantiate $3,000 of this amount, it offered to reduce its settlement demand to $21,425

---

[6] The March Invoice bills Maria for work provided by four subcontractors for painting, repairing copper gutters, and installing: (i) a carpet runner for the front stairs, (ii) granite counters on kitchen and bathroom vanities, (iii) "fireplace surround", and (iv) staircase cap. The March Invoice also includes a Home Depot materials charge of $100.

[7] $22,403 for interest owed on previous late payments, plus interest owed for late payment of a November 2002 invoice.

[8] The pre-Lawsuit correspondence of the parties is in the unnumbered file "Segovia v Bach Construction", submitted into evidence by Victor for the December 3-5, 2007 bankruptcy-court trial.

**MEMORANDUM DECISION** -5-

and to extend the settlement deadline. On December 19, 2003, BCI
informed Victor that it would file suit, absent immediate
resolution of the dispute. BCI mailed Victor a cover page for the
complaint BCI intended to file, and submitted the matter to the
American Arbitration Association.

On February 16, 2004, Victor wrote a letter challenging AAA's
jurisdiction over the dispute and, on February 17, 2004, filed in
the San Francisco Superior Court a complaint on behalf of Maria,
Olga, and Patricia against BCI and its principals, Peter and Hans
Bach, commencing case no. CGC0-04-428834 (Lawsuit). Prior to
filing the Lawsuit, Victor did not give BCI or the Bachs any
specific warning that a suit would be filed, nor is there evidence
that he or any of the other Segovias raised with BCI or the Bachs
any of the claims asserted in the Lawsuit.

Nine days after filing the Lawsuit, Victor filed a first
amended complaint seeking recovery of $973,000 (Amended Complaint).
The Amended Complaint is 30 pages long, and asserts nine claims
against BCI and the Bachs:[9] (1) two fraud claims re alleged
misrepresentations with respect to the remodeling of the
Properties; (2) three reformation-of-contract claims re the
demolition contract, the Remodel Contract, and the oral contract to
remodel the 322 Property, based on alleged violations of Bus. &
Prof. Code § 7159; (3) a section 17200 claim based on alleged
violations of Bus. & Prof. Code § 7159; (4) a claim for alleged
breaches of the covenant of good faith and fair dealing; (5) a
negligence claim (failure of duty to perform and oversee
construction in a competent manner); and (6) unspecified common

---

[9] The Amended Complaint also names as a defendant the Surety
Company of the Pacific, the alleged bonding company for Defendants.

Case: 06-03180   Doc# 88   Filed: 03/20/08   Entered: 03/20/08 16:19:01   Page 6 of 21

counts.  The fraud claims appear to seek recovery of all amounts paid to BCI for the remodel of the Properties.  The section 17200 claim seeks recovery of BCI's profits.  In other words, the Amended Complaint asserts claims well beyond the narrow pre-litigation dispute regarding the March and November Invoices.

In contrast to the scorched-earth approach of the Segovias, Bach's cross-complaint against Maria only sought to recover the amount owing under the November Invoice.

After the Superior Court denied *in toto* the Segovias' two separate motions for summary judgment, the Lawsuit went to trial before a jury, beginning September 19, 2005.  On October 31, 2005, the jury reached its verdict, finding against the Segovias on all of their claims (except the 17200 claim, which was to be tried to by the court).  The jury found the reasonable value of goods and services provided by BCI to be $15,189.[10]  On November 22, 2005, judgment was entered in favor of BCI in the amount of $15,189, with post-judgment interest thereon at the rate of 10% per annum.

On December 16, 2005, the court held a hearing on BCI's motion for attorneys fees and costs.  On January 4, 2006, the court entered an order determining that BCI was the prevailing party, and awarding BCI, pursuant to paragraph 17 of the Remodel Contract, fees and costs in the amount of $610,731.

On January 27, 2006, the court held a hearing on the Segovias' claim under Business & Professions Code section 17200, and denied the claim.

On March 3, 2006, the Superior Court entered an order upon stipulation of the parties reducing the award of fees and costs to

---

[10] This is the amount of the March Invoice.  <u>See</u> <u>supra</u> at 5, n.6.

Case: 06-03180   Doc# 88   Filed: 03/20/08   Entered: 03/20/08 16:19:01   Page 7 of 21

$511,076.  On March 8, 2006, BCI recorded an abstract of judgment in the amount of $526,265.

On May 17, 2006, Maria, her mother Olga, and her sister Patricia each filed a chapter 7 bankruptcy case.[11]  On September 15, 2006, Victor filed a secured claim in the amount of $820,830 for the legal services he provided to Maria beginning on December 1, 2003.[12]

On September 25, 2006, the chapter 7 trustee sold the Properties for $2,240,000, free and clear of the liens asserted by BCI and Victor.

On December 1, 2006, the chapter 7 trustee filed the above-captioned adversary proceeding against BCI, Victor, and Wells Fargo Bank.  The complaint seeks to avoid and the liens recorded by the Defendants in the 90 days before the bankruptcy petitions were filed.[13]

On January 18, 2007, BCI answered the complaint and asserted a cross-claim against Victor, asserting that Victor's claim should be disallowed or equitably subordinated, and seeking declaratory relief.

---

[11] The only claims Maria scheduled other than a first and second mortgage are two credit card claims totaling less than $15,000, a negligence claim by Olga and Patricia for Maria's alleged mismanagement of the remodel, the BCI judgment, and a claim by Victor for attorneys fees and costs.

[12] This amount includes interest at ten percent.  The actual amount of the claim is $726,000.  See infra at 11, n.16.

[13] On March 8, 2007, the trustee filed an amended complaint. The amended complaint does not assert any new claims against the Defendants.

Case: 06-03180   Doc# 88   Filed: 03/20/08   Entered: 03/20/08 16:19:01   Page 8 of 21

1    On April 6, 2007, the court granted Victor's motion to dismiss
2 BCI's claim for declaratory relief, and denied Victor's motion to
3 dismiss BCI's claim objections and equitable subordination claim.[14]

4    On May 7, 2007, Victor answered BCI's cross-complaint and
5 filed a cross-complaint objecting to BCI's claim.

6    Trial on BCI's and Victor's cross-claims was held before this
7 court on December 3-5, 2007.

8 **DISCUSSION**

9    This action presents four issues: (1) BCI's objection to
10 Victor's claim against the bankruptcy estate for prepetition legal
11 services provided to Maria; (2) BCI's objection to Victor's
12 asserted lien on the Property to secure payment of his fees and
13 expenses; (3) BCI's claim for equitable subordination of Victor's
14 claim; and (4) Victor's objection to BCI's claim.  The first two
15 issues are discussed below.  The third issue is moot, as the
16 court's decision to allow Victor's claim in the amount of $50,000
17 appears to leave the bankruptcy estate solvent.  The fourth issue
18 this court resolved at trial, dismissing Victor's cross-claim in
19 its entirety.[15]

20                    **I. Reasonableness of Attorneys Fees**

21    Victor's claim for attorneys fees and costs may be allowed
22 only to the extent it is reasonable.  Section 502(b)(4) provides
23 that a prepetition claim based on services performed by an attorney

24

25    [14] The trustee expressly consented to BCI's prosecution of the
26 equitable subordination claim.

27    [15] This court summarily overruled Victor's objection to BCI's
claim because that claim is based on a final state-court judgment
28 in favor of BCI.  See, e.g., Exxon Mobil Corp. v. Saudi Basic
Industries Corp., 544 U.S. 280, 284 (2005)(pursuant to Rooker-
Feldman doctrine, lower federal courts lack jurisdiction to review
final determinations of a state court in judicial proceedings).

Case: 06-03180   Doc# 88   Filed: 03/20/08   Entered: 03/20/08 16:19:01   Page 9 of 21

or insider shall be disallowed to the extent the claim exceeds the reasonable value of the services performed. Victor's claim is subject to this limit both on the basis that he acted as Debtors' attorney, and on the basis that he is an insider of each of the Debtors. § 101(31)(A)(1). Whether attorneys fees are reasonable for the purpose of section 502(b)(4) is a question of federal law. Landsing Diversified Properties-II v. First Nat'l Bank & Trust Co. of Tulsa (In re Western Real Estate Fund, Inc.), 922 F.2d 592, 597 (10th Cir. 1991).

A claim for attorney fees is unreasonable under federal law to the extent the attorney seeks fees that are disproportionate to the likely recovery. The Ninth Circuit held that prior to commencing an action, an attorney is obligated to consider:

(a) Is the burden of the probable cost of legal services disproportionately large in relation to the size of the estate and maximum probable recovery?

(b) To what extent will the estate suffer if the services are not rendered?

(c) To what extent may the estate benefit if the services are rendered and what is the likelihood of the disputed issues being resolved successfully?

Unsecured Creditors' Committee v. Puget Sound Plywood, Inc., 924 F.2d 955, 959 (9th Cir. 1991). The Ninth Circuit BAP held that a court may abandon the lodestar approach in determining reasonable fees where the "time spent by counsel is not helpful because it is grossly disproportionate to the amount at stake." Digesti & Peck v. Kitchen Factors, Inc. (In re Kitchen Factors, Inc.), 143 B.R. 560, 562 (9th Cir. BAP 1992). Furthermore, the court noted, "an attorney must scale his or her efforts to the 'reasonably expected recovery,' not the potential optimum recovery." Id.

Case: 06-03180   Doc# 88   Filed: 03/20/08   Entered: 03/20/08 16:19:01   Page 10 of 21

Although Puget Sound Plywood and Kitchen Factors interpret the meaning of "reasonable" compensation under section 330 (governing counsel employed by the bankruptcy estate), similar principles should govern the interpretation of "reasonable" fees under section 502(b)(4) (governing counsel employed by debtor prepetition). See In re Boulders on the River, Inc., 169 B.R. 969, 979 (Bankr. D. Ore. 1994) (large fee in action that attorney should have known would be fruitless is not "reasonable" for purpose of section 506(b)). The Supreme Court has stated that an attorney should not in any context be compensated for hours that are not reasonably expended.

> The district court also should exclude from this initial fee calculation hours that were not "reasonably expended." . . . just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. . . ."

Hensley v. Eckerhart, 461 U.S. 424, 434 (1983).

The basic outlines of the present case invite close examination as to whether Victor exercised appropriate billing judgment. At the time Victor filed an action on behalf of Debtors, BCI had claimed it was due $49,436, had indicated it was willing to accept $21,425, and had not initiated legal action against Debtors. The Amended Complaint sought recovery of the entire $973,000 Debtors had paid BCI. The trial court awarded judgment against Debtors in the amount of $526,625 ($15,189 on BCI's original claim plus a fee award of $511,076). For visiting this disaster upon Debtors, Victor asserts a claim for $726,000 in fees and costs.[16]

---

[16] Victor's proof of claim is for $820,830, but that includes interest at ten percent. In December 2005, Victor recorded a Voluntary Attorney's Lien that listed the amount due as $726,000.

In determining whether Victor exercised appropriate billing judgment, the court must first determine the reasonably expected recovery in the action. This should be done free of hindsight, viewing the question in light of the facts and circumstances evident at the time.

The Amended Complaint filed by Victor sought recovery of the entire $973,000 Debtors had paid BCI. The first cause of action asserted that BCI had defrauded Debtors by estimating that the work on the 320 Property would cost $256,000, and then claiming and collecting $324,608. The second cause of action asserted that BCI had defrauded Debtors by estimating that the work on the 322 Property would cost $250,000 and then claiming and collecting $647,399. The third through fifth causes of action asserted that the contracts between BCI and Debtors violated the requirements of section 7159 of the Business and Professions Code and were therefore void. The sixth and seventh causes of action asserted that BCI had violated Business and Professions Code 17200 and the implied covenant of good faith and fair dealing.

It was unlikely that Debtors would prevail on their claims under section 7159 to void the contracts and recover all the amounts paid to BCI. Admittedly, the written Remodel Contract re the 320 Property did not comply with all of the technical strictures of Business & Professions Code section 7159,[17] and the oral contract re the 322 Property wholly failed to comply with that section. The California Supreme Court held, however, that in appropriate circumstances, contracts violating section 7159 will be

_____

[17] Section 7159 details precisely what language home improvement contracts must contain, such as what must be on the first and last pages of the contract, what the headings must say, and the minimum permissible font size.

enforced in order to "'avoid unjust enrichment to a defendant and a disproportionately harsh penalty upon the plaintiff.'" <u>Asdourian v. Araj</u>, 38 Cal.3d 276, 292 (1985) (citation omitted).  In the same decision, the court cited with approval a prior decision enforcing a wholly oral home improvement contract in circumstances much like those of the present case.  <u>Id.</u> at 293-94 (citing <u>Calwood Structures Inc. v. Herskovic</u>, 105 Cal. App. 3d 519 (1980)).  In <u>Asdourian</u> and <u>Calwood</u>, as in the present case, the homeowner was sophisticated, the homeowner and builder were social friends who had past business dealings, the contractor performed according to the parties' agreement, and the homeowner accepted the improvements provided by the contractor.  <u>Id.</u> at 293.  Victor should have known that, given the similarity of the facts at issue to those in <u>Asdourian</u> and <u>Calwood</u>, a court would be unlikely to void the contracts between Maria and BCI, and that BCI likely would be allowed to recover on a *quantum meruit* basis.

Victor should have known that Plaintiffs were no more likely through their fraud claims to be able to recover money already paid.  Maria, a sophisticated businesswoman, voluntarily paid all of the amounts billed re the 320 Property.  She questioned only $140,000 of the amounts billed re the 322 Property.  Furthermore, after questioning BCI regarding the scope of services provided to remodel the 322 Property, Maria voluntarily paid all but $49,436 of the billed amount ($647,399).  In total, Maria paid $972,000 (95%) of the approximately $1,031,443 billed by BCI.  In such circumstances, it is unlikely that she would recover these payments under a fraud theory.  <u>See</u> <u>American Oil Service v. Hope Oil Co.</u>, 194 Cal. App. 2d 581, 586 (1961) ("a payment voluntarily made with

knowledge of the facts affords no ground for an action to recover it back.").[18]

Victor did have some basis to expect that Plaintiffs *might* require BCI to disgorge the profits earned on the Project.  An unreported California appellate decision held that the failure to use a written contract containing the provisions required under section 7159 can constitute an unfair business practice under Business and Professions Code 17200.  <u>Mallery-Feiner Co. v. Tersol</u>, 2002 WL 31854956 (Cal. App. 6th Dist. 2002).[19]  The court held that the contractor could be required to disgorge the profit earned, even though the contractor was allowed some recovery in *quantum meruit* under <u>Asdourian</u> to prevent unjust enrichment.  Plaintiffs had at least a colorable claim for such relief, because the written contract for the 320 Property did not satisfy all the requirements of section 7159, and there was no written contract for the 322 Property.

It should be noted, however, that Plaintiffs' claims under section 17200 were weaker factually than those at issue in <u>Tersol</u>.  The contractor in <u>Tersol</u> had provided no written contract whatsoever.  <u>Id.</u> at 3.  In the present case, BCI provided an extensive written contract for remodel of the 320 Property in which the deviations from the requirements of section 7159 were minor, and the work on the 322 Property could be construed as an expansion of the project re the 320 Property.  <u>See</u> <u>supra</u> pp. 3-4.  In <u>Asdourian</u>, the California Supreme Court noted with apparent

---

[18] This doctrine does not impair Plaintiffs' claims regarding the disputed March and November Invoices.

[19] This court could find no other decision that addressed whether a violation of section 7159 was an unfair business practice under section 17200.

Case: 06-03180   Doc# 88   Filed: 03/20/08   Entered: 03/20/08 16:19:01   Page 14 of 21

sympathy that many contractors remain unaware of all of the highly technical regulations governing home improvement contracts. Asdourian, supra, 38 Cal 3d at 294, n.12.

Had Plaintiffs prevailed on the section 17200 claim, they would likely have recovered approximately $81,000. Plaintiffs paid BCI approximately $973,000, which included a ten-percent profit.[20]

It thus appears that Plaintiffs had a *reasonable* possibility of recovering less than $150,000. They had a reasonable chance of disputing the approximately $25,000 BCI claimed due but that Plaintiffs had not yet paid. They appear to have been successful in disputing BCI's claim for approximately $25,000 in prejudgment interest.[21] Based on Tersol, Plaintiffs had a reasonable possibility of requiring BCI to disgorge profits of approximately $80,000.

I find that the $726,000 Victor seeks[22] is grossly disproportionate to the amount realistically at stake in the litigation. In such circumstances, this court need not determine the amount to be allowed on a lodestar basis, and may instead calculate a reasonable fee from the amount recovered or some other

_____

[20] BCI's profit was a ten-percent markup applied to materials and labor. BCI added another ten-percent markup for overhead. Thus, on costs of $100,000, profit would be $10,000 and overhead would be $10,000, yielding a total amount due of $120,000. The appropriate formula for determining profit from the total amount paid is: profit = total/12. Using this formula, the profit earned by BCI on the $973,000 paid was $81,083.

[21] The jury awarded BCI the amount of the March Invoice, which waived interest, and not the amount of the November Invoice, which included interest.

[22] See supra at 9, n.14.

Case: 06-03180   Doc# 88   Filed: 03/20/08   Entered: 03/20/08 16:19:01   Page 15 of 21

measure of what was at stake in the litigation.[23] <u>Puget Sound</u>
<u>Plywood</u>, <u>supra</u>, 924 F.2d at 959-61; <u>Kitchen Factors</u>, <u>supra</u>, 143
B.R. at 563.

I find that $50,000 is the maximum amount that can be allowed
to Victor as reasonable compensation. In so finding, I rely upon
the following facts and circumstances. First, Victor should have
known that the maximum recovery Plaintiffs were likely to obtain
was less than $150,000. Second, Victor should have known that *any*
substantial recovery was highly questionable: (a) because the court
was likely to allow *quantum meruit* under <u>Asdourian</u>; (b) because
Maria had paid without protest virtually the entire amount BCI
sought as *quantum meruit*; and (c) because the case for disgorgement
or profits was weaker than in <u>Tersol</u>, where the contractor never
supplied any written contract. Thus, Victor had reason to know
that Plaintiffs might lose and be forced to pay BCI's fees. Third,
Victor acknowledges that Plaintiffs have already reimbursed him
$150,000 for costs. Had Victor properly scaled his efforts to the
maximum likely recovery, the costs incurred would have been much
less. The $50,000 allowed claim is intended to be all-inclusive,
and Victor is not allowed any additional recovery for costs.
Fourth, the results achieved were not good. In fact, the results
achieved were a disaster for Plaintiffs. BCI had offered to accept
$21,425 in full satisfaction of its claim. Plaintiffs ended up
owing BCI $526,625.

---

[23] An additional reason for not calculating the fee to be
allowed on the basis of time spent is that Segovia acknowledges
that he does not have contemporaneous time records. He testified
that his original time records were lost when he dropped his
computer, and that he had to reconstruct his time.

## II. Validity of Attorney Lien

BCI contends that Victor's lien against the Property is invalid, because it does not comply with California Rule of Professional Conduct 3-300. Under that Rule, an attorney who takes a lien on property of a client to secure repayment of fees acquires an interest that is adverse to the interest of the client. Fletcher v. Davis, 33 Cal.4th 61, 68-70 (2004). An attorney may properly take such a lien only under the following circumstances.

> (A) The transaction or acquisition and its terms are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which should reasonably have been understood by the client; and
> (B) The client is advised in writing that the client may seek the advice of an independent lawyer of the client's choice and is given a reasonable opportunity to seek that advice; and
> (C) The client thereafter consents in writing to the terms of the transaction or the terms of the acquisition.

Cal. R. Prof. Conduct 3-300.

The written attorney lien Victor relies upon was executed in two separate stages that occurred two years apart.

On December 1, 2003, Olga, Patricia, Maria, and Victor executed a written fee agreement (the Fee Agreement). The Fee Agreement provides in writing that Victor will have a lien on any recovery obtained from BCI and on the clients' real property.

> Clients grant Attorney a lien on all their claims and causes of action that are the subject of the representation of Clients under this Agreement, on all proceeds of any recovery obtained (whether by settlement, arbitration award, or court judgment) and on *all real property* for attorney's fees and costs advanced. . . . If there is no settlement or no recovery or the recovery is insufficient to reimburse Attorney in full for outstanding attorneys fees earned and costs advanced, Clients grant Attorney permission to file a notice of lien upon *their real property* in substantially the same form as shown in Attachment 2.

Fee Agreement, ¶ 11 (emphasis added).

Case: 06-03180   Doc# 88   Filed: 03/20/08   Entered: 03/20/08 16:19:01   Page 17 of 21

The Fee Agreement informs the clients that they can retain independent counsel at their own expense to advise them regarding the Fee Agreement. It is unclear whether a blank attorney lien form was actually attached to the Fee Agreement that was submitted to the clients. There is no evidence that the attorney lien form was completed and signed by the clients before December 2005 (two years after execution of the Fee Agreement). It is also unclear how much time the clients were afforded to consult independent counsel between the time they were presented with the Fee Agreement and the time they signed that Agreement.

On December 16, 2005, Olga, Patricia, and Maria signed a form entitled California Voluntary Attorney's Lien that Victor had completed (the Lien Form). The Lien Form specified the amount of fees to be secured as $726,000, and identified the Property by assessor's parcel, street address, and metes and bounds. The Lien Form was recorded on the same day it was signed. The Lien Form does not inform the clients that they may consult independent counsel before executing the form. It is not clear how much time the clients were afforded to consult independent counsel between the time they were presented with the Lien Form and the time they signed that form.

Victor did not explain to his clients either orally or in writing, either in 2003 or in 2005, that his holding a lien on the Property could enable him to force a sale of their residence without their consent. Nor did he explain that his holding a lien on the Property could prevent them from selling or borrowing against the Property without either paying his lien in full or obtaining his consent. None of the clients at any time actually

consulted independent counsel about the Fee Agreement or the Lien Form.

Based on the facts set forth above, I determine that the attorney lien asserted by Victor is not an enforceable lien created in compliance with Rule 3-300.

The Fee Agreement does not create an enforceable lien, because it does not adequately describe the property to be encumbered. The asserted attorney lien is technically a mortgage, because it provides that real property is "hypothecated for the performance of an act." Cal. Civ. Code § 2920. A mortgage can be created only via a writing "executed with the formalities required in the case of a grant of real property." Id. § 2922. Real property can be adequately identified by assessor's parcel, street address, or metes and bounds. 12 Witkin, Summ. of Calif. Law, Real Property § 271 (10th ed. 2005). The reference in the Fee Agreement to: "all real property" and "their real property" does not remotely satisfy this standard.

The Lien Form does not comply with Rule 3-300, because it does not inform the clients that they may consult with an independent attorney regarding the creations of the lien. Although the Fee Agreement did contain the required statement, it would be wholly inappropriate to read the two documents together and thereby treat the Fee Agreement as curing this defect in the Lien Form. The clients received the completed Lien Form more than two years after they signed the Fee Agreement.

Based on the finding that the attorney lien asserted by Victor does not comply with Rule 3-300, I conclude that the lien is not enforceable. Although Rule 3-300 does not specify the remedy to be

1    applied upon breach, the California Supreme Court has held that an
2    attorney lien that does not comply with Rule 3-300 is invalid.

            We therefore conclude that an attorney who secures
        payment of hourly fees by acquiring a charging lien
        against a client's future judgment or recovery has
        acquired an interest that is adverse to the client, and
        so must comply with the requirements of rule 3-300.
        Fletcher failed to comply with the rule.  Accordingly,
        Fletcher's lien may not be enforced in this proceeding.
        Were we to hold otherwise, "we would, in effect, be both
        countenancing and contributing to a violation of a rule
        we formally approved in order to 'to protect the public
        and to promote respect and confidence in the legal
        profession.'"

Fletcher, supra, 33 Cal.4th at 71-72 (citations and footnotes
omitted).

**CONCLUSION**

    For the reasons stated above, the claim filed by Victor
Segovia is allowed only in the amount of $50,000 and only as a
general unsecured claim.  The California Voluntary Attorney's Lien
recorded on December 16, 2005 shall have no force or effect.

                **\*\*END OF MEMORANDUM DECISION\*\***

Case: 06-03180   Doc# 88   Filed: 03/20/08   Entered: 03/20/08 16:19:01   Page 20 of
21

1          **<u>Court Service List</u>**

2   Daniel M. Linchey, Esq.
    Goldberg, Stinnett, Meyers and Davis
3   44 Montgomery Street, Suite 2900
    San Francisco, CA 94104
4
    David B. Draper, Esq.
5   Law Offices of Terra Law
    177 Park Avenue, 3rd Floor
6   San Jose, CA 95113

7   Victor A. Segovia, Esq.
    Segovia Law Office
8   712 Bancroft Road, Suite 268
    Walnut Creek, CA 94521
9
    Austin P. Nagel, Esq.
10  Law Offices of Austin P. Nagel
    5776 Stoneridge Mall Road
11  Suite 360
    Pleasanton, CA 94588
12
    Michael C. Fallon, Esq.
13  Law Offices of Michael C. Fallon
    100 E Street, Suite 220
14  Santa Rosa, CA 05404

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM DECISION**                    -21-